NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250516-U

NO. 4-25-0516

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 28, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Cass County |
| BENCHY R. COULOUTE, | ) | No. 25CF29 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Timothy J. Wessel, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Doherty and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Because the motion for relief, on which defendant has chosen to stand on appeal, fails to explain why the circuit court erred by finding that, by "remov[ing] himself from the State of Illinois immediately after the murder," defendant showed he was highly likely to resort to willful flight to avoid prosecution (see 725 ILCS 5/110-6.1(a)(8) (West 2024)), the legitimacy of that finding is effectively uncontested, and there is a basis for affirming the denial of pretrial release as not against the manifest weight of the evidence.

¶ 2    Defendant, Benchy R. Couloute, appeals from an order of the Cass County circuit court denying him pretrial release. Because his motion for relief, on which he has chosen to stand on appeal, fails to explain why leaving Illinois and going to Indiana immediately after the charged murder does not demonstrate (as the court found) a high likelihood of willful flight to avoid prosecution, he has failed to establish that the denial of pretrial release is against the manifest weight of the evidence. Therefore, we affirm the circuit court's judgment.

¶ 3                                I. BACKGROUND

¶ 4                                    A. The Charges

¶ 5          On April 11, 2025, the State filed an information consisting of four counts. The first three counts charged defendant, on various *mens rea* theories, with the first degree murder of Junior N. Kalonji (720 ILCS 5/9-1(a)(1), (2) (West 2024)), alleging that on March 24, 2025, he cut Kalonji's throat. The fourth count charged defendant with committing home invasion at 1200 State Street in Beardstown, Illinois, the residence in which he allegedly inflicted the fatal knife wounds on Kalonji (*id.* § 19-6(a)(2)).

¶ 6                      B. The Petition for the Denial of Pretrial Release

¶ 7          The same day it filed the charges, the State filed a verified petition to deny defendant pretrial release. According to the petition, "[t]he proof [was] evident or the presumption great that *** defendant committed an offense listed in [section 110-6.1(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-6.1(a) (West 2024))]." Citing subsection (a)(1) (*id.* § 110-6.1(a)(1)), the petition asserted that defendant was charged with a

> "felony offense, other than [a] forcible felony, for which, based on the charge or defendant's criminal history, a sentence of imprisonment, without probation, periodic imprisonment or conditional discharge is required by law upon conviction, and the defendant's pretrial release poses a real and present threat to the safety of any person or persons or the community."

¶ 8          Alternatively, citing subsection (a)(8) (*id.* § 110-6.1(a)(8)), the petition claimed that defendant "ha[d] a high likelihood of flight to avoid prosecution" and noted he was "charged with" a "felony described in" subsections (a)(1) through (a)(7) (*id.* § 110-6.1(a)(1) to (a)(7)).

¶ 9                          C. The Hearing on the Petition

¶ 10                            1. *Discovery of the Body*

- 2 -

¶ 11        On April 14, 2025, the circuit court held a hearing on the State's petition for the denial of pretrial release. The evidence at the hearing tended to show the following.

¶ 12        On March 24, 2025, Alexandra Baptiste was separated from defendant, her spouse, and was in a sexual relationship with Kalonji, who lived at 1200 State Street in Beardstown. She did not think that anyone else knew of the relationship.

¶ 13        Natalie Florestal, Baptiste's aunt, also lived in Beardstown, and Baptiste would often stay with her. Suspecting that defendant was trying to track her, Baptiste would often swap vehicles with Florestal—although, as it turned out, no tracker was found on Baptiste's vehicle, but a tracker was found near the muffler of Florestal's vehicle.

¶ 14        At 1:17 a.m. on March 24, 2025, Baptiste left Florestal's house and drove to Kalonji's house. At approximately 3 a.m., Baptiste was in bed with Kalonji when she was awakened by the opening of Kalonji's bedroom door and the sweep of a flashlight beam across the bedroom. Baptiste woke Kalonji up and urged him to get out of bed and investigate. Reluctantly, Kalonji got out of bed and looked around, but he found no intruder.

¶ 15        At 6:45 a.m. on March 24, 2025, Baptiste's alarm went off. She got up, left Kalonji's house, and returned to Jacksonville, Illinois, where her son was watching her younger children. (Special Agent Lucas Baugher of the Illinois State Police, who was in charge of the murder investigation, was asked at the hearing, "And where were her children?" He answered, "They were at, I believe, either [defendant's] house or her sister's house, and her son was watching the kids.") After taking the children to daycare, Baptiste "returned to her sister's house," as Baugher put it. Baptiste was scheduled to work in the afternoon and evening at Dot Foods in Mount Sterling, Illinois, but because she was feeling ill, she did not go to work.

¶ 16        At 7:25 a.m. on March 24, 2025, Baptiste spoke with defendant on the telephone.

Defendant told her he was going to Indiana and that he would be back in a few days.

¶ 17	At 11 a.m. on March 24, 2025, a woman named Sasha, who lived at 1200 State Street, saw Kalonji, and he was alive at that time.

¶ 18	During the afternoon of March 24, 2025, after returning to Jacksonville, Baptiste called Kalonji's telephone number over and over again, but he did not answer. She grew concerned and tried to persuade others to go check on him. In the mid to late afternoon of March 24, 2005, at least one person, named Serge, went to 1200 State Street in Beardstown to look for Kalonji. At last, Baptiste drove from Jacksonville to 1200 State Street in Beardstown to check on Kalonji for herself. She found him in his bedroom in the basement, lying unresponsive on his bed. The sheets were bloodstained. She called 911.

¶ 19	Kalonji had been stabbed 13 times in the throat and the back of the neck, and he was dead at the scene. According to Dr. Nathaniel Peterson, who performed an autopsy, these knife wounds were the cause of Kalonji's death.

¶ 20	After the police interviewed her, they requested that Baptiste make a phone call to defendant. She did so. In their phone conversation, defendant told Baptiste that he knew she had talked to the police and that she had told the police about the trackers. Defendant would neither confirm nor deny to her that he knew what happened on the morning of March 24, 2025. He seemed agitated and angry and refused to tell her his location or address.

¶ 21	2. *Jeanine Furah*

¶ 22	The police interviewed Jeanine Furah, defendant's coworker and friend. Defendant had confided in her about his family problems. In one of their conversations, defendant asked Furah if she knew Kalonji. He told her he believed that Baptiste was in a relationship with Kalonji and that since the approach that defendant had taken to this problem

thus far had proven ineffectual, he felt compelled to act—by which Furah understood him to mean he would get a divorce.

¶ 23      Furah told the police that she last spoke with defendant at about 10:30 p.m. on March 24, 2025. She had telephoned him to try to ascertain if he knew anything about the events of that day. He told her he was in Indiana or on his way to Indiana. He kept asking her, in an agitated tone of voice, what was going on. He wanted her to give him updates about Beardstown.

¶ 24                          3. *Videos and a Borrowed Truck*

¶ 25      On the evening of March 23, 2025, Florestal and her friend saw, from inside Florestal's house, a man in dark clothing trying, apparently, to break into Florestal's vehicle. Moments later, Florestal and her friend drove down the street, looking for the man. They found him and recorded him as they drove by: it was defendant.

¶ 26      There was also a surveillance camera at a boat shop across the street from Florestal's house. The camera faced the front of the house, and at 8:07 p.m. on March 23, 2025, it recorded a man in dark clothing using a flashlight to tinker underneath Florestal's vehicle.

¶ 27      Another video from the surveillance camera showed Baptiste leaving Florestal's house at 1:17 a.m. on March 24, 2025, and, after she drove away, a man in dark clothing running from the vicinity of a laundromat near Florestal's house, climbing into a vehicle, and taking off in the direction of Baptiste's vehicle.

¶ 28      This surveillance camera at the boat shop repeatedly recorded a tan Ford truck traveling to and from the vicinity of Florestal's house. In one of the videos, the driver of the truck appeared to be manipulating a white towel on the dashboard.

¶ 29      The police found out who owned the tan Ford truck: it was Wudolph Polose (spelled phonetically in the hearing transcript), a close associate of defendant. Polose confirmed

to special agents that on March 23 and 24, 2025, he lent the truck to defendant.

¶ 30 The police obtained a search warrant and took possession of the tan Ford truck to inspect it for evidence. In the cab of the truck, crime scene investigators found small drops of a red blood-like substance, which they swabbed. They sent the swabs to the crime laboratory for analysis. As of April 14, 2025, the date of the hearing, the results of the laboratory analysis were still pending.

¶ 31 4. *Eve*

¶ 32 A woman named Eve (whose last name appears to be unspecified in the record) told the police that defendant had requested to borrow her car. When she learned, however, that he used to work for a police unit in Haiti that was notorious for its violent methods of dealing with the public, she declined to lend him her car and from then on tried to avoid him.

¶ 33 5. *Cell Phone Data*

¶ 34 The Illinois State Police obtained historical data regarding defendant's cell phone. From this data, they learned that on the evening of March 23, 2025, and early morning of March 24, 2025, defendant traveled between Beardstown and Mount Sterling. He then would go to Jacksonville and come back to Beardstown, specifically, to the vicinity of Florestal's house.

¶ 35 On cross-examination, however, there was the following exchange between defense counsel and Special Agent Baugher:

"Q. Do you have any evidence that puts [defendant] at [Kalonji's] house?

A. Generally, looking at the cellphone records going off of pings, those can be whether, you know, ten meters accuracy or 500 meters up to 1,500 meters. Me, along with a couple of agents in the office did a general overview of the records, the exigent [*sic*] records. We were able to determine seeing his phone

close to the residence. How close, I'm not able to say today. We'll have our analysts review the full records when they come in.

Q. So the answer to my question is, no, you do not have any proof that he was at [Kalonji's] house?

A. That's correct.

* * *

Q. Has a murder weapon been found?

A. No."

¶ 36　　　On redirect examination, the prosecutor asked Baugher if the cell phone data lined up with the surveillance videos. Baugher answered that, "[b]y and large," it did. The prosecutor then asked whether there was "a surveillance video, either from across the street or the same block, around 6:55 a.m. that put[ ] that truck at the crime scene." Baugher answered, "Yes. You can see the truck driving very close to the crime scene, that's correct."

¶ 37　　　　　　　　　　　　　6. *The Arrest*

¶ 38　　　The Illinois State Police informed the Indiana State Police that they were looking for defendant and that their investigation led them to believe he was in the Indianapolis area. The Indiana State Police managed to locate defendant. They went to an apartment building and took positions in the front and back of the building. Defendant attempted to flee out of the back door (according to Baugher's testimony), but when he saw detectives waiting for him there, he surrendered and was arrested without incident.

¶ 39　　　　　　　　　　D. The Denial of Pretrial Release

¶ 40　　　On April 14, 2025, the circuit court entered an order granting the State's petition for the denial of pretrial release. In its check-the-box order, the court "[found] by clear and

convincing evidence that the proof is evident or the presumption great that the Defendant had committed a misdemeanor or felony offense for which pretrial release [might] be denied." The court further found, by clear and convincing evidence, that he was "charged with any offense under [section 110-6.1(a)(1) to (a)(7)] other than stalking or aggravated stalking" and that his "pretrial release poses a real and present threat to the safety of any person or persons or the community."

¶ 41    Also, in its order, the circuit court found, by clear and convincing evidence, that "Defendant has a high likelihood of willful flight to avoid prosecution and is charged with any felony described in [subsections (a)(1) to (a)(7)]" or with "a felony offense other than a Class 4 offense."

¶ 42    The circuit court further found, by clear and convincing evidence, that "no condition or combination of conditions set forth in [section 110-10(b) (725 ILCS 5/110-10(b) (West 2024))] can mitigate the real and present threat to the safety of any person or persons or the community, or the Defendant's willful flight, based on the specific articulable facts of the case."

¶ 43    For an explanation of why "Defendant should be denied pretrial release and why less restrictive conditions cannot mitigate the real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case, or prevent the Defendant's willful flight from prosecution," the circuit court checked the boxes corresponding to the following preprinted language: (1) "Nature and circumstances of the offense(s) charged" and (2) "The identity of any person or persons to whose safety the Defendant is believed to pose a threat, and the nature of the threat." In addition, next to "Other," the court wrote, "Testimony of def[endant] learning of wife's affair. Eyewitness observed defendant place tracker on vehicle.

Red blood-like substance. Defendant fled to Indiana & attempted to flee prior to apprehension."

¶ 44                    E. Motion to Reconsider Pretrial Detention

¶ 45          On April 28, 2025, defendant filed a document titled "Motion to Reconsider Pretrial Detention." In his motion, he made four contentions.

¶ 46          First, defendant contended that the circuit court had erred by finding, by clear and convincing evidence, that "the proof [was] evident or the presumption great that [he] committed" the charged offenses. See *id.* § 110-6.1(e)(1). He disputed that "being present in a town where his wife or the Defendant" (perhaps he meant, instead, the deceased) "may be located, allegedly placing a tracking device on a third parties' [*sic*] vehicle which is neither the wife nor the victim's vehicle, and riding to Indiana with a friend are clear and convincing" evidence that he murdered Kalonji.

¶ 47          Second, defendant contended the circuit court had erred by finding, by clear and convincing evidence, that his pretrial release would "pose[ ] a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case." *Id.* § 110-6.1(a)(1). He argued, "[T]here was no evidence presented that the Defendant was ever a danger to his wife or that he even so much as threatened his wife or the victim."

¶ 48          Third, defendant contended that the circuit court had denied him the presumption of innocence by stating, " 'Based upon the charges and his actions, I do not see any condition or combination of conditions that can mitigate the real and present threat.' " The State had the burden of proving, by clear and convincing evidence, that "no condition or combination of conditions" could "mitigate *** the real and present threat to the safety of any persons or persons or the community, based on the specific articulable facts of the case." *Id.* § 110-6.1(e)(3). Defendant disputed that the State had carried that burden of proof.

¶ 49          Fourth, defendant contended that the circuit court had erred by finding, by clear and convincing evidence, that he was prone to willful flight. Pretrial release could be denied to defendant if he "ha[d] a high likelihood of willful flight to avoid prosecution." *Id.* § 110-6.1(a)(8). Defendant argued that his mere act of exiting through the back door of the apartment building did not prove an attempt to flee, for "there was no evidence presented the Defendant even knew the police were there."

¶ 50          F. The Hearing on the Motion for Reconsideration

¶ 51          On May 5, 2025, the circuit court held a hearing on defendant's motion for reconsideration of pretrial detention.

¶ 52          At the hearing, defense counsel proffered three recordings of telephone calls that defendant had made to the Cass County dispatcher. To quote defense counsel, "[t]he substance is simply him trying to get in touch with the police because people are telling him that the police are looking for him and are accusing him." According to defense counsel, these calls demonstrated that defendant was "not trying to evade police contact," especially considering that, afterward, he signed a document for voluntary extradition from Indiana to Illinois.

¶ 53          The prosecutor then called Special Agent Baugher, who testified he had received a report from the crime laboratory to which the police had sent the swabs from the tan Ford truck. According to the report, Kalonji's DNA was in the substance that crime scene investigators had swabbed from the brake pedal of the truck. In other words, Kalonji's DNA was in the truck that defendant had been driving. After receiving the report, the police questioned the owner of the truck, Polose. He told the police he did not know Kalonji or why Kalonji's DNA would be in the truck.

¶ 54          G. The Order Denying the Motion for Reconsideration

¶ 55       On May 8, 2025, the circuit court entered an order denying the motion for reconsideration of pretrial detention, which the court construed as a "Motion for Relief from Pretrial Detention." The order gave the following reasons for denying relief:

"1. The State continues to prevail on its burden by showing by clear and convincing evidence that the Defendant is still a flight risk as willful flight was previously found. The only facts that have changed is that the Defendant made three phone calls to the Cass County Sheriff asking if he was being investigated for murder. Clearly, for investigative purposes, safety issues, and flight issues, the Sheriff and State Police did not respond to these inquiries. The fact still remains that the Defendant removed himself from the State of Illinois immediately after the murder and then tried to evade Indiana State Police. For these reasons and the reasons previously stated on the record and in the Detention order, The Court finds the Defendant has participated in willful flight, he remains a flight risk, and his further detention is necessary. Motion is denied.

2. Further and additionally, the State continues to prevail on its burden by showing by clear and convincing evidence that the Defendant still poses a real and present threat to not only to [*sic*] the public but also specifically to multiple witness's [*sic*] safety. During an additional proffer by the State during the motion hearing, the State's investigation has increased the probability that the Defendant did indeed murder the victim. A vehicle that the Defendant had access to and was shown driving during the timeframe of the murder was found to have the victim's blood and therefore his DNA inside the vehicle. No other plausible facts were given why the victim's blood would be in the vehicle. Evidence was given how

- 11 -

the Defendant, prior to the murder, stalked his estranged wife and her Aunt. The Defendant has ties to multiple locations outside the United States and no conditions can secure his residency within this jurisdiction. The Defendant has failed to show how or why those safety concerns no longer exist or how conditions or a combination of conditions could mitigate this 'dangerousness'. Clearly, the State continues to meet its burden that the Defendant continues to pose a real and present threat to the community (and specifically multiple witnesses), and no condition or a combination of conditions can mitigate the 'dangerousness' the Defendant poses. Motion is also denied for these reasons and the reasons previously stated on the record and in the Detention Order."

¶ 56    On May 19, 2025, defendant filed his notice of appeal.

¶ 57                                II. ANALYSIS

¶ 58    Defendant has notified us that, "[p]ursuant to Rule 604(h)(7)" (Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024)), he "is not filing a memorandum." Therefore, "[t]he motion for relief"—which is what the circuit court construed the motion for reconsideration to be (see *People v. Singh*, 2025 IL App (4th) 250115-U, ¶ 23)—"will serve as the argument of the appellant on appeal." Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024).

¶ 59    The argument in the motion for relief must convince us that the denial of pretrial release is against the manifest weight of the evidence.

> "[W]hen live witness testimony is presented at a pretrial detention hearing, the circuit court's ultimate detention decision under section 110-6.1 [(725 ILCS 5/110-6.1 (West 2024))], in addition to any underlying factual findings supporting the decision, will not be disturbed on review unless found to be contrary to the

manifest weight of the evidence." *People v. Morgan*, 2025 IL 130626, ¶ 54. At both the hearing on the verified petition for denial of pretrial release and the hearing on defendant's motion for reconsideration (which is to say, his motion for relief), the State made its evidentiary presentation through the live testimony of Special Agent Baugher. Because "live witness testimony [was] presented at [the] pretrial detention hearing" (*id.*), the question for us, on appeal, is whether the court's decision and the findings on which the decision is based are against the manifest weight of the evidence. In other words, we ask whether it is "clearly evident" that defendant is entitled to pretrial release or whether the court's findings are "unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Coe*, 2024 IL App (5th) 240976, ¶ 28.

¶ 60        This deferential standard of review is not the only restraint under which we evaluate the merits of this appeal. We also should refrain from deciding more than we have to decide. "Courts of review *** ordinarily will not consider issues where they are not essential to the disposition of the cause or where the result will not be affected regardless of how the issues are decided." *Barth v. Reagan*, 139 Ill. 2d 399, 419 (1990). We are paying attention to the necessity of determination because although the motion for relief (or motion for reconsideration) made four contentions, if defendant failed to establish error in his fourth contention, it would not matter whether he established error in the preceding three contentions. To put it differently, if, in his motion for relief, defendant failed to make a cogent argument that the circuit court's finding of a high likelihood of willful flight was against the manifest weight of the evidence, it would not matter whether the court's remaining findings, which he attacked in the preceding three contentions, were against the manifest weight of the evidence.

¶ 61        The high likelihood of willful flight to avoid prosecution can be an independent

basis for denying pretrial release. Section 110-6.1(a)(8) provides that, "[u]pon verified petition by the State, the court shall hold a hearing and may deny a defendant pretrial release only if" various alternative circumstances exist, including the following:

"(8) the person has a high likelihood of willful flight to avoid prosecution and is charged with:

(A) Any felony described in subdivisions (a)(1) through (a)(7) of this Section; or

(B) A felony offense other than a Class 4 offense." 725

ILCS 5/110-6.1(a)(8) (West 2024).

Defendant was charged with a Class M felony and a Class X felony. So, he was charged with "[a] felony offense other than a Class 4 offense." *Id.* § 110-6.1(a)(8)(B). Therefore, the circuit court could deny him pretrial release if he "ha[d] a high likelihood of willful flight to avoid prosecution"—or at least defendant does not argue otherwise in his motion for relief. *Id.* § 110-6.1(a)(8).

¶ 62        In fact, in his motion for relief, the only argument that defendant makes on willful flight is in this final numbered paragraph of his motion:

"14. The court goes on to state it can base its detention on willful flight, because the Defendant took a vehicle he did not own and placed himself in Indianapolis, Indiana and when the Indiana police approached the front door the Defendant tried to leave out the back door to avoid apprehension there was no evidence presented the Defendant even knew the police were there."

That is the sum total of defendant's argument on willful flight. He does not explain why leaving Illinois and going to Indiana immediately after the murder did not qualify as "willful flight to

avoid prosecution." *Id.* We express no opinion one way or another on that question. Rather, our point is that, in his motion for relief, on which he has chosen to stand on appeal, defendant makes no argument on that question.

¶ 63    "Whether made in the motion for relief alone or as supplemented by the memorandum, the form of the appellant's arguments must contain sufficient detail to enable meaningful appellate review, including the contentions of the appellant and the reasons therefore and citations of the record and any relevant authorities." Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024). Because the motion for relief fails to explain why the circuit court erred by finding that, by "remov[ing] himself from the State of Illinois immediately after the murder," defendant showed he was highly likely to resort to willful flight to avoid prosecution (see 725 ILCS 5/110-6.1(a)(8) (West 2024)), the legitimacy of that finding is effectively uncontested, and consequently, there is a basis for affirming the denial of pretrial release.

¶ 64                                  III. CONCLUSION

¶ 65    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 66    Affirmed.